# IN THE COURT OF APPEALS OF IOWA

No. 22-0682
Filed August 17, 2022

**IN THE INTEREST OF K.R. and K.R.,**
**Minor Children,**

**S.R., Mother,**
    **Appellant.**

_____

    Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, District Associate Judge.

    The mother appeals the termination of her parental rights to her two children. **AFFIRMED.**

    David R. Fiester, Cedar Rapids, for appellant mother.

    Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

    Rebecca Williams, Cedar Rapids, attorney and guardian ad litem for minor children.

    Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

The mother appeals the termination of her parental rights to her two children, born in 2013 and 2018.[1]  The juvenile court ordered termination under Iowa Code section 232.116(1)(f) (as to the older child) and (h) (as to the younger child) (2021).  The mother argues the children could have been returned to her care at the time of the termination trial or, in the alternative, that she should be given additional time to work toward reunification before a permanency decision is made.  She asserts that termination of her parental rights is not in the children's best interests and the bond she shares with the children precludes termination.

We review termination proceedings de novo.  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).  "We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116."  *Id.*

Here, for the juvenile court to properly terminate the mother's parental rights under section 232.116(1)(f) and (h), proof of several elements, including that the children could not be returned to parental custody at the time of the termination trial, had to be established.  *See* Iowa Code § 232.116(1)(f)(4), (h)(4); *see also D.W.*, 791 N.W.2d at 707 (applying "at the present time" to mean "at the time of the termination hearing").  Here on appeal, the mother concedes all elements but the return-to-parental-custody element.  The court concluded the mother continued to use methamphetamine, which prevented the children from being safely returned to the mother's care; the mother challenges this conclusion.

---

[1] The parental rights of each child's father were also terminated; neither father appeals.

Initially, concerns over the mother's alleged heroin use led to the Iowa Department of Human Services's (DHS) involvement with this family. After learning the mother was using methamphetamine while caring for the children, DHS removed the children from the mother's care in January 2021. By the mother's own admission, she used methamphetamine daily from March to June 15, 2021. Then, according to the mother's testimony, she "just quit cold turkey" on June 15, 2021. Yet the mother had seven sweat-patch tests that were positive for methamphetamine between July 16, 2021, and the termination trial in February 2022.[2] As she did to the juvenile court, the mother claims those tests are unreliable; she pointed to urinalysis tests she completed during the same time frame that were negative for all illegal substances. To explain these results, she asked the juvenile court to consider a scientific study that states external contamination of sweat patches is possible. *See* David A. Kidwell & Frederick P. Smith, *Susceptibility of PharmChek Drugs of Abuse Patch to Environmental Contamination*, *available at* https://www.ojp.gov/pdffiles1/nij/195986.pdf (last visited Aug. 4, 2022).

But the scientific study the mother offers supports the conclusion that she was ingesting methamphetamine rather than having positive sweat-patch tests due to exposure and external contamination. As we understand it, the mother maintained that her continued positive results were due to her sweaty skin touching clients—whom she presumes use methamphetamine—at the strip club where she was employed. The scientific study the mother introduced to support this claim

---

[2] It is of note that the mother only completed eighteen of fifty-nine drug tests offered.

characterizes this as "prior presence of drugs on the exterior of the skin, not removed by the cleaning process (external contamination from within, under the patch, CFWI)." *Id.* at 2. The study references a number of experiments and concludes that having methamphetamine on one's skin before the sweat patch is placed on, and then "exercise and active sweating" after application of the patch, can result in a sweat patch test that is positive for methamphetamine—even when no methamphetamine is ingested. *Id.* at 13. However, in these instances, "[n]o conversion of methamphetamine to amphetamine was observed." *Id.* They concluded: "This experiment shows that CFWI appears in the patch rapidly when the individual actively sweats. . . . Methamphetamine did not decompose or be metabolized into amphetamine. Alcohol swab 'cleansing' removed some, but not all, of the drug contamination." *Id.* at 14. Additionally, the researchers opined:

> The laboratory studies show that the potential for external contamination of skin (CFWI) . . . can occur and generate false positive results. . . .
> To the extent that drugs must pass through the human body to produce metabolites, metabolites can increase the reliability of a positive result. . . . [A]mphetamine is the major metabolite of methamphetamine . . . . [M]ethamphetamine is relatively stable and thus the presence of amphetamine may be a marker that the drug excreted from the human body rather than entered the patch from the outside.

*Id.* at 17–18.

While the study the mother offered states that outside contamination—i.e. positive sweat patch tests for methamphetamine without ingesting the drug—is possible, it also states that in the experiments where that occurred, no amphetamine was found in the test results. In fact, it suggests that the presence of amphetamine, as the major metabolite of methamphetamine, may actually be

"a marker that the drug excreted from the human body" and was not the result of external contamination. *Id.* at 18. Here, the mother had seven sweat patches that were positive for methamphetamine between July 16, 2021 and February 8, 2022, and each of those seven patches also had amphetamine present. According to the study relied upon by the mother, the presence of amphetamine supports the conclusion that she was ingesting the methamphetamine rather than receiving a positive result due to external contamination. In spite of the mother's claims otherwise, we agree with the district court that the mother continued to use methamphetamine up until the time of the termination trial and that her use of the drug prevents her from being able to safely parent the children. *See, e.g.*, *In re J.P.*, No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) ("A parent's methamphetamine use, in itself, creates a dangerous environment for children."). The State proved the grounds for termination under 232.116(1)(f) and (h).

In passing, the mother mentions that she should be given more time to work toward reunification with her children. Section 232.104(2)(b) allows the court to give a parent a six-month extension before permanency is established if there are specific "factors, conditions, or expected behavioral changes" that "comprise the basis for the determination that the need for removal of the child[ren] . . . will no longer exist at the end of the additional six-month period." We cannot make such findings. At the time of the termination trial, the mother continued to use methamphetamine—notwithstanding her claims about unreliable drug tests. Additionally, she had recently married a man who was in jail after reporting him for domestic violence against her. According to the mother's testimony, her now-husband provided her with methamphetamine, is "violent" and a "thief," and is not

safe or appropriate for the children to be around. Yet the mother remained in contact with the husband in violation of a no-contact order between the two and, due to this continued contact, both the husband and mother had to serve jail sentences. The mother claimed she was trying to divorce the husband, but she also admitted talking to the husband on the first day of the termination trial because he knew it was "an important day for [her]." Based on these facts, we cannot say the mother will be able to safely parent the children in six months, so an extension is not warranted. And for the same reasons, we conclude termination of the mother's parental rights is in the children's best interests. *See* Iowa Code § 232.116(2); *see also In re T.P.*, 757 N.W.2d 267, 271 (Iowa Ct. App. 2008) (concluding termination was in the children's best interests because "the children need a safe and permanent home").

Finally, the mother argues her rights should not be terminated "due to the bond between the children and their mother." We understand her to be invoking the exception to termination in section 232.116(3)(c). *See* Iowa Code § 232.116(3)(c) (allowing the court to forego termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). The parent bears the burden to prove an exception to termination is warranted. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). Other than broadly testifying[3] that she believes termination of parental rights "destroys people," the mother did not offer any

---

[3] The mother's attorney asked if she felt "[her] kids would be damaged" by termination, and the mother responded: "Yes. I know what it's like. I know a lot of other foster kids too. It destroys people."

evidence to establish why the exception should be applied here.  Like the juvenile court, we decline to apply it.

We affirm the termination of the mother's parental rights to both children.

**AFFIRMED.**